MEMORANDUM OF DECISION ON RESPONDENT MOTHER'S MOTION TO REVOKE COMMITMENT
This memorandum of decision addresses the Motion to Revoke Commitment filed by the respondent mother, Maria B., on January 22, 2002 in an effort to regain custody of her children Wayne J., Jr. (Wayne) and Nyrieka B-J. These children are currently under commitment to the Department of Children and Families as the result of court orders entered on May 23, 2001 (Swienton, J.) finding both Wayne and Nyrieka to be neglected. Through the pending motion, Maria B. asserts that Wayne and Nyrieka should be returned to her care because "the cause for commitment no longer exists and revocation is in the children's best interests." Motion to Revoke Commitment filed January 22, 2002.[2] The petitioner filed no written objection to the motion, but left Maria B. to her proof. Upon due consideration, the court denies the pending motion to revoke commitment, but issues orders consistent with the reunification of the respondent mother and the children at issue in this case.
The matter was brought before the Child Protection Session, and was heard on April 23, June 25, August 16, and 19, 2002.[3] Trial witnesses included a psychiatrist who had treated Wayne; Wayne's current therapist, two prior therapists, and his foster care liaison from the Village for Families and Children (the Village); Maria B's former therapist, Maria B.'s parenting education counselor, and her past domestic violence counselor; and DCF social workers. Numerous documents were presented in evidence. The petitioner and both respondent parents were vigorously represented by counsel throughout the proceedings, as were the children.[4] The movant Maria B. attended each day of trial, CT Page 11473 although the children's father, the respondent Wayne J. (Wayne Sr.) was consistently absent.[5] Prior to the close of evidence, counsel for the movant-mother, the children and the commissioner each submitted detailed, comprehensive proposed orders for the court's consideration.
Having brought the motion to revoke commitment, Maria B. bears the two-pronged burden "to allege and prove that cause for cause for commitment no longer exists." (Citations and quotation marks omitted.) Inre Alexander C., 60 Conn. App. 555, 559, 760 A.2d 532 (2000); see also Practice Book § 33-10.[6] "Once that has been established, the inquiry becomes whether a continuation of commitment will nevertheless serve the child's best interests." (Quotation marks omitted.) Id. Only if this burden is met by Maria B., a natural parent who has moved for revocation of commitment, does the burden then shift to the petitioner, who must prove "that it would not be in the best interest of the child to be returned to his or her natural parents." (Quotation marks omitted; citations omitted.) In re Cesar G., 56 Conn. App. 289, 292, ___ A.2d ___
(2000). Upon review, the evidence fails to support the allegations brought forward by Maria B., leading the court to deny the pending motion to revoke. In reaching this determination, the court has made the following findings of fact utilizing the appropriate standard of proof in this matter, which is proof "by a fair preponderance of the evidence."[7]
Practice Book § 33-10.
 I. FACTUAL FINDINGS
Wayne was born August 1994. HistoricalJy, he was physically and emotionally abused by Wayne Sr., and he was physically abused by Maria B., as well. As a first grader in the public school, Wayne's aggressive behavior became cause for concern by staff members and other students. Although in an effort to address his psychological needs, Wayne had been assigned a therapist at the Village, Maria B. brought the child to only three out of nine scheduled counseling sessions. Thereby, the child was effectively deprived of the mental health care he so dearly required, without reasonable cause therefor.
Near the time of commitment, Wayne was admitted to the ABC Unit at Mt. Sinai Hospital (MSH) for provision of acute psychiatric care. At the time, Wayne displayed severe difficulties with aggression and impulsive behaviors, requiring medication for stabilization and control. Diagnosed at MSH with Attention Deficit Hyperactivity Disorder (ADHD) and identified as a victim of child abuse, as he neared his seventh birthday, Wayne was also followed for issues of gender identity disorder. At discharge from MSH during the summer of 2001, Wayne was in need of a structured therapeutic living environment with skilled CT Page 11474 supervision and staffing sufficient to address his continuing outbursts, aggressive behavior and medication management. (Testimony of Laura C., Richard S., M.D.)
Wayne's needs were adequately met by his transfer to the Eagle House, a subacute residential center at the Village. (Testimony of Laura C.) In this setting, he received continuing care and both group and individual therapy for his issues related to conduct control, anger management, the establishment of appropriate physical boundaries with peers, and separation from Maria B.[8] (Testimony of Adbul B.) In the spring of 2002, Wayne was discharged from the subacute facility, and transferred to care at a therapeutic foster home which is sponsored by the Village. Wayne is the only child living in this foster home. His discharge diagnosis included Post-Traumatic Stress Disorder, ADHD, Child Abuse Victim, Eneuresis, and Rule Out Gender Identity Disorder. (Testimony of Abdul M., Eduardo V.)
Since April 2002, Wayne has received counseling from Eduardo V., a case manager for the Village's specialized foster care program. Now eight years old, Wayne is doing very well at his foster home, where he continues to receive regularly administered anti-anxiety medication and treatment for his continued eneuresis, and where his feminized behaviors are not the subject of inappropriate ridicule or focus. Wayne attends school sessions at Connecticut Children's Medical Center (CCMC) in a continuing effort to address his special behavioral needs: although he has no academic problems, Wayne still exhibits unacceptable levels of defiance and aggressive conduct in the classroom, which leads to sanctions, suspensions, and failing grades. Consistent with the evidence of Wayne's current conduct in the presence of other children, the court credits the well-founded, unequivocal opinions of Abdul M., the social worker who provided Wayne's therapy at the Eagle House subacute facility: Abdul M. clearly established that Wayne's unstable and problematic psychological condition render it absolutely necessary for him to be in the care of persons who have skill, training, and education in how to appropriately manage the child's behaviors, particularly when he feels that he is not receiving enough attention. The court further credits Adbul M.'s opinion that if Wayne is placed in a home with another child, the caretaker will have to be competent in methods of time management, as well, so that appropriate attention can be spread to both children. (Testimony of Abdul M.)
Nyreika was born on January 1998. A highly verbal child, she has no known health or behavioral issues. She is doing very well in DCF-sponsored foster care. (Testimony of Kyle K.) At age four and a half, Nyreika clearly lacks the ability to protect herself from physical CT Page 11475 danger or abusive disciplinary measures, and requires adult supervision to keep her safe.
Both Wayne and Nyreika love their mother very much. Both children wish to return to Maria B.'s care, and they look forward to the reunification process.
 II. MOTION TO REVOKE
Maria B. has met the first nominal prong of her burden in this matter, having nominally alleged a number of reasons why "the cause for commitment no longer exists" as required by In re Alexander C., supra,60 Conn. App. 559. (Motion to Revoke.) She has alleged that she "reengaged (repeated) individual counseling, domestic violence counseling and parenting classes; retained gainful employment for seven months; retained her apartment; and regularly visited her children. (Motion to Revoke.) As such, Maria B. has alleged that she complied with some, but not all, of the obligations set forth in the specific steps ordered by the court at the time of commitment: she urges the court therefor to find that she should now be identified as an appropriate caretaker for the children. (Exhibit B.)
The court declines to accept Maria B.'s proposal as, upon review, the evidence is insufficient to support the majority of her stated allegations. It is uncontested that Maria B. has remained employed at a local fast food establishment, and that she still resides in her own apartment. However, despite the exhaustive examination of multiple witnesses conducted by Maria B.'s counsel, the totality of the evidence fails to fulfil her burden of proof with regard to her other allegations of compliance with the specific steps. First, the court finds that a preponderance of the evidence does not show that Maria B. has adequately "re-engaged" in individual counseling, as asserted in the motion to revoke. The evidence shows that although Maria B. commenced a program of individual counseling at Catholic Family Services (CFS) in September 2001, and although the respondent mother attended some therapy sessions, her attendance overall was "poor." Maria B. last attended individual counseling on January 16, 2002, and thereafter voluntarily discontinued the sessions.[9] Maria B. still requires therapeutic attention to her personal issues which include a history of abuse in her family of origin, abuse by her partner Wayne Sr., the placement of her oldest child in long-term foster care, and her lack of understanding that abusive treatment is neither acceptable nor accepted in healthy human relationships. (Testimony of Ingrid H.) By the close of evidence on August 19, 2002, Maria B. had not yet completed a program of individual counseling sufficient to meet her needs. While she is not now involved in CT Page 11476 individual counseling, Maria B. is on waiting lists with several local providers. (Testimony of Kyle K.) However, at this point she has failed to prove, by a preponderance of the evidence, her allegation that she has actually engaged individual counseling to any meaningful degree.
Second, the court finds that the preponderance of the evidence does not show that Maria B. has adequately "re-engaged" in parenting classes, as asserted in the motion to revoke. Rather, the evidence establishes that while she is now regularly attending such classes, she only commenced the process on July 10, 2002, when she began parenting education classes at CFS. This valuable program has two components, with the first part of each session devoted to teaching a specific parenting skill, while the second part consists of a group support discussion about the members' parenting successes and challenges. (Testimony of Katherine L.) Maria B. is now participating in the program; however, she has failed to prove, by a preponderance of the evidence, her allegation that she has completed a program of parenting education, or that she has benefitted therefrom so as to assure the safety of children in her care.
Third, as to domestic violence counseling, the court finds that the preponderance of the evidence does not show that Maria B. has adequately "re-engaged" in this service, as asserted in the motion to revoke. The evidence does reflect that Maria B. commenced a relevant CFS program on November 14, 2001. At the time the Motion to Revoke was submitted to the court in January 2002, Maria B. was an active participant in the program. However, thereafter, she discontinued attendance, without completing the domestic violence counseling program. Months later, during the summer of 2002, Maria B. re-engaged in the CFS domestic violence program, and began to develop insight into and understanding of the events that led her to tolerate domestic violence in her home. She completed the classes on July 3, 2002, just prior to commencing the CFS parenting education program. (Testimony of Eric R.)
Despite her attendance at the CFS domestic violence program, the preponderance of the evidence shows that Maria B. allowed and permitted Wayne Sr. to enter her home in July 2002 at a time when Nyrieka was present during a period of unsupervised visitation.[10] The specific steps in effect at that time clearly warned: "Mother is not to allow father in the home — no contact." (Exhibit B.) Maria B.'s decision to allow or permit Wayne B. not only to enter but to remain at her home in Nyreika's presence clearly violated the applicable specific step; demonstrates the minimal benefit she derived through attendance at domestic violence classes; proves that she remains vulnerable to influences from others and therefore lacks the ability to make proper judgments for the safety of her children;[11] and establishes that the CT Page 11477 respondent mother is still unable or unwilling to "break the cycle of violence" in which she was engaged with Wayne Sr. (Testimony of Eric R., Kyle K.) Ominously, despite her vigorous protest to the contrary, a preponderance of the evidence proves that Maria B. failed on this occasion to do anything at all to prevent Wayne B. from entering her home, that she failed to keep her daughter from having contact with him, and that she has, as yet, refused to take any responsibility for her actions.[12]
Under these circumstances, the court cannot conclude that Maria B. has proved, by a preponderance of the evidence, that cause for commitment no longer exists because she has "re-engaged (repeated)" in domestic violence counseling: to do so would elevate the form, being Maria B.'s mere presence at a domestic violence program, over substance, represented by what instruction was provided and what the respondent could have learned at CFS through her attendance in late 2001 or in the summer of 2002. The court declines the opportunity to do so, as the best interests of the child require Maria B. to prove not that she merely went to domestic violence counseling, but that she obtained due benefit therefrom.[13]
Fourth, the court finds that the preponderance of the evidence does not show that Maria B. has adequately "re-engaged" in a critical aspect of visitation with the children, notwithstanding her assertion in the motion to revoke. During a critical period of Wayne Jr.'s stay at the Village's subacute unit, during the summer of 2001, Maria B. was offered the opportunity to visit her son and to participate in family therapy with him. The court finds, by a preponderance of the evidence, that Maria B. did not make reasonable attempts to participate in the family therapy process with Wayne under these circumstances, but that during the commitment period she left the child to make his way toward recovery without her assistance. This behavior is quite similar to that which led to the institution of the underlying neglect petition, when Maria B. had failed to expend adequate energy or parental resources to obtain the mental health care her son so clearly needed. (Testimony of Kyle K.) In addition, Maria B. missed many visits when Wayne was at the Village's subacute facility following his discharge from MSH, leaving the child without visitation during the entire months of November and December 2001, just prior to the submission of the motion to revoke. (Testimony of Abdul M.) Furthermore, Maria B. recently missed two visits with Wayne during the summer of 2002,[14] leaving the child disappointed and hurt by her absence now as she did in the past, to the continuing detriment of the child's recovery process.[15] (Testimony of Stephaney S., Abdul M.) Thus, although Maria B. has visited with Wayne on a number of occasions, the court cannot find, by a preponderance of the evidence, either that she has adequately attended to this task, or that she has recognized the grave impact of her absence upon her troubled young son. CT Page 11478
Moreover, a review of the totality of the evidence establishes that Maria B. has not met the second prong of her burden, which requires her to prove by a preponderance, as noted above, "that cause for cause for commitment no longer exists." In re Alexander C., supra, 60 Conn. App. 559, Practice Book § 33-10. The cause for commitment of these children included Maria B.'s inability or unwillingness to protect them from the direct or indirect influence of Wayne Sr.'s violent behavior, her own physical abuse of Wayne, and as well as her inability or unwillingness to serve as an active participant in the process of providing the mental health care which is so clearly called for in view of Wayne's special needs. (Testimony of Kyle K.) Examined in its entirety, the evidence leads to the determination that Maria B. remains unable or unwilling to protect her children from Wayne Sr., and that she has not yet developed the capacity to reasonably attend to Wayne. Although she has kept a job and an apartment, attended some classes, and thereby made some progress in managing her own life, Maria B. remains significantly affected by the fundamental problems that formed the basis for DCF's original intervention on behalf of her younger children. Therefore, she cannot prevail on this aspect of her motion.[16]
Two aspects of the evidence compel the determination that cause for commitment still exists as to Wayne and Nyreika. First, as found above, the preponderant evidence establishes that Maria B. remains unwilling or unable to protect her children from contact with Wayne Sr. It is indeed troubling that despite any individual therapy or domestic violence counseling she may have received in the past, Maria B. either lacks, or is unable or unwilling to utilize, a basic understanding of her obligation to comply with court orders prohibiting contact between Wayne Sr. and the children, or the fundamental safety issues that are presented by continued unsupervised contact between any members of her family unit and the respondent father. Until Maria B. develops personal insight and parenting skills which enable her to comprehend the necessity for protecting her children, and until she has developed motivation which is sufficient to achieve this goal, both children will be at risk when they in her care. At the present time, this factor indicates that Maria B. cannot serve as an appropriate caretaker for either Nyreika or Wayne B., as the cause for commitment still exists.
Second, as found above, despite her protestations to the contrary, the preponderant evidence also establishes that Maria B. remains unable or unwilling to pay appropriate attention to Wayne's fundamental need for mental health services. In the past, she has failed to demonstrate the capacity or willingness to attend visits with him on a consistent basis, and thus has not shown that she has the skills or motivation to provide CT Page 11479 parenting at a level that will aid the child's recovery process. While some progress has been made in developing Maria B.'s capacity in this regard, the results remain largely untested. In addition, as found above, Wayne continues to suffer from a panoply of psychological conditions which require care and supervision by therapeutically-trained individuals, such as the foster parents who now provide his care. He still carries the diagnoses of Post-Traumatic Stress Disorder, ADHD, Child Abuse Victim, Eneuresis, and Rule Out Gender Identity Disorder. (Testimony of Abdul M., Eduardo V.) Wayne's aggressive behaviors continue to plague the child when he is in the presence of others, such as in a classroom setting. Wayne still requires a residential setting in which he is the only child, as he is not yet ready to peacefully coexist with a sibling. (Testimony of Abdul M.) To assist in Wayne's recovery, during the summer of 2002 he started therapy with Stephaney S., a psychologist at the Village: she will provide the child with individual therapy to way to help him deal with his poor impulse control, history of trauma, aggressive behavior, and other problems. The court credits Stephaney S's well-founded opinion that given the child's history, it will not be until October that Wayne B. will be sufficiently psychologically stable to allow Maria B. to be incorporated into the family therapy. Maria B's attentive involvement in family therapy is a predicate to commencement of the process of reunifying mother and son.
At present, therefore, the evidence is insufficient to allow a determination as to an approximate date on which Wayne B. will be well enough to allow transition from his current foster home, where his emotional and physical needs are well met, back into his mother's care. (Testimony of Stephaney S., Eduardo V.) As far as Nyrieka is concerned, in the summer of 2002, during the course of this hearing, DCF arranged for a worker from Klinberg Family Reunification services to facilitate a meaningful parenting education process for Maria B. through supervised visits with Nyreika three days a week. As found in Part I., DCF's provision of unsupervised mother-daughter visits was interrupted by Maria B.'s unfortunate decision to allow Nyreika to have contact with Wayne Sr., outside of direct DCF supervision. These factors provide ample basis for the court's conclusion that cause for commitment still exists as to both children at issue in this case.
In sum, while Maria B. will have the opportunity to demonstrate her capacity to provide adequate attention to her children's needs during the next months, at present the court is constrained to conclude that the respondent mother is presently unable or unwilling to appropriately attend to Wayne's mental health needs, follow court orders, or protect her children from Wayne Sr. Under these circumstances, even though the children have clearly voiced their desire for return to their mother's CT Page 11480 care, the court finds that the cause for the commitment still exists, warranting denial of the pending motion to revoke commitment.
 III. ORDERS
1. The respondent mother's Motion to Revoke Commitment filed January 22, 2002 is hereby DENIED.
2. The respondent mother shall not cause, allow or permit her children to have any contact or communication with Wayne Sr., except that contact or communication which is authorized by DCF in writing. The respondent mother shall promptly prepare, in writing, and shall follow an appropriate safety plan for use if Wayne Sr. requests contact or communication with either child. The respondent mother shall share the written safety plan with DCF.
3. The respondent mother will continue and fully participate in the parenting education classes in which she is currently enrolled at CFS. The respondent mother will demonstrate that she knows and is able and willing to apply reasonable methods of child management (discipline) outside of the classroom setting.
4. The respondent mother will promptly engage in individual counseling to address her anger management, self esteem, self-awareness, judgment and domestic violence issues, as well as her historical issues related to her status as an abuse victim. DCF will promptly facilitate the respondent mother's identification of an available licensed therapist who can provide such counseling, and will provide payment for such fees for this service as mother is reasonably unable to pay. DCF will notify the respondent mother, in writing, when an available licensed therapist has been identified, and will provide explicit instructions for the respondent mother to follow in securing the services of the therapist.
5. The respondent mother will not use any tool, device or implement in the course of providing child management (discipline) to her children.
6. The respondent mother will participate in supervised visitation with Wayne and family therapy sessions at the direction of Stephaney S., the child's psychologist. The respondent mother will cooperate with the family therapy sessions in an effort to aid the mother-son reunification process. The respondent mother may send cards or letters with reasonable content to Wayne in care of DCF, who will provide the communications to Stephaney S. for use in the child's therapy sessions.
7. The respondent mother will cooperate in the process of Klinberg Family CT Page 11481 Reunification services at her home. The respondent mother shall have full, supervised visitation with Nyreika at her home according to the schedule followed by the Klinberg worker: DCF shall provide transportation for Nyreika to these visits with the respondent mother, but the Klinberg Family Reunification shall provide the supervision.
8. Five weeks hence, Nyreika shall commence three 2-hour visitation sessions per week. These sessions shall be unsupervised, shall continue for three weeks and shall take place at the respondent mother's home or at another safe location agreed upon by the respondent mother and DCF. No other persons shall participate in these visitation sessions, which are intended to further promote the mother-daughter bond.
9. Upon completion of the three weeks of visitation specified in ¶ 8, a once-weekly overnight visit, providing 24 additional hours of mother-daughter contact, shall be added to the visitation schedule. This enhanced visitation schedule shall continue for another three weeks, at which time an in-court review shall take place to consider any progress that has been made in the reunification process.
10. The respondent mother shall be responsible for securing her own transportation to any visits with Wayne that may be scheduled, and to all therapy sessions referenced herein. If the respondent mother finds herself unable to secure such transportation, she may move the court for relief, specifying the basis therefore in writing.
11. The respondent mother and Nyreika shall promptly participate in an updated psychological evaluation and interactional assessment conducted by Bruce Freedman, Ph.D. Wayne shall not participate in any such evaluations unless his psychologist, Stephaney S., determines that it will not cause harm to the child's recovery process.
12. The specific steps imposed upon the respondent mother on May 23, 2001 shall remain in effect and coordinated with the foregoing orders.
BY THE COURT,
N. Rubinow, J.